CHARLES R. SCOTT, Circuit Judge.
This is a petition for writ of certiorari ■directed to the Florida Industrial Commission by the claimant to review an order of the full commission which reversed an ■order of the deputy commissioner awarding •claimant compensation against Carter Fruit and Produce Co.
The petitioner-claimant suffered an injury to his right elbow as a result of an ■“accident” on March 10, 1958, while employed by Kaler Produce Company when he slipped and fell while lifting a 100 pound bag of potatoes, and the bag of potatoes fell on his arm, which was resting on the steel body of a produce truck. The deputy commissioner made an award based upon a finding of six weeks temporary total disability and no permanent disability.
In January, 1959, the claimant went to work for Carter Fruit and Produce Co., and worked until March, 1959. On October 28, 1959, a claim was made against Carter for temporary partial disability resulting from accidental injury alleged to have been sustained by claimant in February, 1959, in the course of his employment with Carter. On October 28, 1959, claimant also made a further claim against Kaler alleging that his disability resulting from lifting bags in the course of his employment with Carter was either a manifestation of the symptoms of the original accident to his elbow while working for Kaler, or constituted a new injury arising out of and in the course of his employment with Carter during February, 1959, which had aggravated a pre-existing condition.
The deputy commissioner by his compensation order found in part:
“That claimant injured his right elbow in March 1958 in the course of his employment with Kaler Produce Company and re-injured his right elbow in February 1959 in the course of his employment with Carter Fruit and Produce Company; said injuries being both by accident arising out of claimant’s employment at each time.
“That as a result of the 1958 accident claimant was temporarily and totally disabled for a period of six weeks for which he was paid proper workmen’s compensation by the carrier, Southern General Insurance Company, at the rate of $35.00 per week.
“That as the result of the 1959 accident claimant was temporarily and totally disabled for a period of ten weeks for which he is entitled to workmen’s compensation at the rate of $35.00 per week.
“That as the result of the combined effect of the two aforesaid accidental injuries to claimant’s right elbow claimant has sustained a permanent partial disability of ten percent loss of use of right arm entitling claimant to workmen’s compensation for twenty weeks at the rate of $35.00 per week.
*575 “That 75% of claimant’s permanent partial disability resulted from the original accidental injuries of 1958 and 25% of claimant’s permanent partial disability resulted from the subsequent accidental injury of 1959.-
“That in the compensation Order heretofore entered in the case of Claim No. Y-66851, a mistake in the determination of fact was made in that claimant did not recover from the 1958 accidental injury without permanent disability; that at the time of the entry of said compensation Order on July 25, 1958, Dr. John E. Burch, the attending orthopedist, was of the opinion that claimant would have no permanent disability as the result of the accident of 1958; that on May 11, 1960, Dr. John E. Burch, after treating the claimant further, was of the opinion that claimant had a permanent partial disability of 10% loss of use of right arm due to the two accidental injuries of 1958 and 1959 and that claimant had a resultant permanent partial disability of 7.5 percent loss of use of right arm attributable to the 1958 accidental injury and a resultant permanent partial disability of 2.5 percent loss of use of right arm attributable to the 1959 accidental injury; that on May 11, 1960, Dr. Francis W. Glenn was of the same opinion as that of Dr. Burch in reference to claimant’s permanent partial disability caused by the 1958 accidental injury to claimant’s right arm.
“That claimant while lifting a hundred pound bag of potatoes for Kaler Produce Company in March, 1958, slipped and fell backwards on a metal floor striking his right elbow on the floor and injuring same.
“That claimant while working for Carter Fruit and Produce Company in February 1959 again injured his right arm in lifting heavy sacks of potatoes and strained the extensor muscles of the right elbow thereby aggravating the pre-existing condition of the claimant’s right arm known as ‘tennis elbow’ caused by claimant’s fall on said elbow in 1958.
“That at the time claimant was injured in 1958 his average weekly wage was $70.00; that at the time claimant was injured in 1959 his average weekly wage was $60.00; that claimant’s rate of compensation is therefore $35.00 per week.
“That though claimant has reached maximum degree of recovery from said accidental injuries and is working his ‘tennis elbow’ may require further medical treatment. According to Dr. Burch ‘these “tennis elbows” are subject to recurrence and no one can predict when it will flare up again’.”
Kaler and its carrier did not apply for a review of the order of the deputy commissioner but Carter and its carrier did, and contended that the claimant did not sustain an injury by “accident” while employed by Carter. The full commission found that there was no competent substantial evidence to support the finding of the deputy commissioner that claimant sustained an “accident” while employed by Carter and reversed the deputy commissioner by striking from his award all provisions requiring Carter to pay workmen’s compensation benefits, and affirmed the findings of the deputy commissioner as to the payments to be made by Kaler.
The first question to be decided is whether or not the claimant sustained an injury by “accident” while employed by Carter. We quote the following excerpts from the claimant’s testimony upon which the order of the deputy commissioner finding an “accidental” injury while employed by Carter in 1959 was based.
“Q. When you went to work for them, for Carter Produce, were you having any trouble at the time you went to work for them with your arm ?
*576 “A. Not right at the time. I wasn’t having the same trouble as I had when I—
“Q. Were you having any trouble with your arm at the time you went to work with Carter Produce Company?
“A. My arm was all right then because I had long come from under Dr. Burch’s treatment, so I went to work there and as I would lift, it would just gradually get sore. So I couldn’t say that I hurt it at Carter because I know when I was working for Kaler Produce Company back on that truck, I know it happened. That 100-pound bag of potatoes 'fell on my arm on that steel body of the truck, and it really gave me a bad feeling at that time.
“Q. Did you have any fall at Carter Produce Company?
“A. No, not at all.” Record, pp. 23-24.
“Q. You said that at the time you went to work with Carter Fruit & Produce, you were having no trouble with your arm at that time?
“A. No.
“Q. How long did you work for them before you started having trouble with your arm?
“A. Well, I didn’t work with them— I wasn’t a regular man. I was an ■extra man. I worked there about six, seven weeks I guess. Mr. Carter ■can tell you. Pie is there. I wasn’t there too long.
“Q. Before you started having trouble ?
“A. Yes.
“Q. Now, how soon after you ■started having trouble did you stop working for them ?
“A. It was around, to my remembrance, March, around March, I guess, ■of 1959.
“Q. I don’t think you understood my question. When you started having trouble again with your arm while you were working for Carter, did you stop working for them right away or did you keep working for them?
“A. I kept on working.
“Q. How long did you keep working?
“A. Oh, to my remembrance, maybe three or four weeks, something like that, and I didn’t tell them anything about it. I just kept on working and I figured it would get all right.
“Q. What were you doing when you started having this trouble with your arm while you were working for Carter? Were you lifting anything at that time?
“A. I was lifting 100 pounds and different other produce like lettuce.
“Q. Potatoes?
“A. Yes.
“Q. 100-pound bags ?
“A. Yes, 50-pound bags, and they were all mixed up with light work, but everytime I would lift something real heavy, I could feel this soreness come into my arm.
“Q. And you were lifting that stuff by yourself?
“A. Yes.
“Q. Now, you say you started having this trouble six or seven weeks after you went to work with them, and you had it three or four weeks and then you quit them?
“A. Yes.” Record, pp. 26-27.
“THE COMMISSIONER: Now, when do you remember the first time after you left Dr. Burch in 1958 that you really started having trouble with you arm?
*577 “THE WITNESS: During the time when I started working down at the Carter Produce. After I started working there I guess about three or four weeks, I commence feeling this stinging and soreness.
“THE COMMISSIONER: You were with Carter about three or four weeks and then you started feeling your arm bother you ?
“THE WITNESS: Yes. Now, I worked there, I guess, about six or seven weeks.” Record, p. 41.
“Q. Up until the time you went to work for Carter, had you put your right arm to the test of lifting 100-pound bags all day long?
“A. Not all day long, no, sir, because I wouldn’t dare do it.
“Q. You felt there was something wrong with your arm even before you went to work for Carter?
“A. Yes, sir. I knew there was something wrong, because I feel that numbness.
“Q. And it was only after a hard day’s work lifting 100-pound bags all day long that you felt pain at night ?
“A. Yes, sir.
“Q. And numbness at night?
“A. Yes. Then even before that, I could still feel it right in here (indicating).
“Q. When you say ‘before that,’ you mean before you worked for Carter ?
“A. Yes.
“Q. Did you ever tell Bill Carter here that you had had an accident on the job?
“A. No, sir.
“Q. Did you ever tell him that you had hurt yourself working for him?
“A. No, sir.
“Q. As a matter of fact, up to this day you haven’t said anything to him about being hurt?
“A. No, sir. I never told him I was hurt on this job, never have.” Record, pp. 47-48.
“Q. Now, you know from working around various employers that if you feel you have hurt yourself on the job, you are to report it to your employer ?
“A. Yes.
“Q. And the person that you would report it to at Carter would be Bill Carter ?
“A. Yes, the same as I did when I hurt myself. I reported it right away and he told me to go to Jackson Memorial Hospital, and I went the same night.
“Q. There was plenty of opportunity had you been injured at Carter or had an accident at Carter to tell them ?
“A. I could have told them, yes.
“Q. Do you see him from time to time around the market and you have seen him ever since you worked there ?
“A. Yes.” Record, p. 50.
“Q. Do you know how many weeks or months you worked at Carter ?
“A. Now, I will say for five or six weeks, something like that, regular.
“Q. As a regular?
“A. As a regular, you know.
“Q. That is your recollection?
“A. Yes.
“Q. But you worked for him at different times?
“A. Yes, between times, part-time. Maybe, I would say, eight or nine hours.” Record, p. 51.
*578 “Q. Let me ask you this: Between the last time you saw Dr. Burch and the time you went to work for Carter, you didn’t need any treatment to your arm, did you ?
“A. Until it commenced giving me soreness.
“Q. And that was after you went to work with Carter, three, four, five weeks or so afterwards?
“A. Yes.
“Q. Now, between the time you left Dr. Burch in 1958 and the time you went to work for Carter in 1959, you certainly lifted poratoes, didn’t you?
“A. I didn’t lift no 100-pounds. I lifted ordinary 50-pound bags because Shaw & Burdick, they don’t handle no 100 pounds. The only thing they handle is 50 pounds down to like gladiolas and so forth.
“Q. You were able to lift 50-pound sacks of things?
“A. Yes, it didn’t give me trouble. I can pick up a 50-pound bag with one hand.
“Q. But you used both ?
“A. Yes.
J}5 % ífc Jjt ‡ ‡
“Q. When you started having trouble with your arm in March or whenever it was in 1959, while with Carter, did you know that you were supposed to or even could make a report of an injury to Carter and get treatment or benefits and that sort of thing?
“A. Yes, if I had hurt my arm, I would have said so.
“Q. You were working there when your arm started to hurt you?
“THE WITNESS: Yes, sir. I was working there.
“Q. Now, you told us that you had some numbness in your elbow between the time you saw Dr. Burch in 1958 and when it started bothering you working for Carter in 1959, but as I understand it, the first time you had any pain in your arm was distinguished or as opposed to numbness was after the Carter potato lifting time ?
“A. Yes, when it really started to give me soreness.” Record, pp. 53, 54, 55.
Section 440.02(19) Florida Statutes, F.S.A. provides:
“(19) ‘Accident’ shall mean only an unexpected or unusual event or result, happening suddenly. A mental or nervous injury due to fright or excitement only or disability or death due to the accidental acceleration or aggravation of a venereal disease or of a disease due to the habitual use of alcohol or narcotic drugs, shall be deemed not to be an injury by accident arising out of the employment. Where a pre-existing disease is accelerated or aggravated by accident arising out of and in the course of the employment, only acceleration of death or the acceleration or aggravation of disability reasonably attributable to the accident shall be compensable.”
We hold that the foregoing excerpts from the testimony of the claimant show conclusively that he did not suffer an “accident” while employed by Carter in 1959 within the above definition of “accident” as interpreted by the Courts of Florida.
In Firestone Fire and Rubber Company v. Hudson (Fla.App.1959), 112 So.2d 29, the claimant had worked approximately ten years for Firestone adjusting and relining brakes, working with master cylinders, repairing tires, which included their removal from and replacement on rims, and installing new tires. While he was changing a tire in the early part of December, 1955, *579 he suffered a pain in his chest. He continued to work until about the middle of December, at which time his condition was diagnosed as myocardial infarction.
The deputy commissioner found that any permanent partial disability which the employee suffered was not due to an “accident” arising out of and in the course of his employment.
The full commission in its order found: Text 30
“Claimant has applied for a review from this Order, urging essentially that the Deputy erred by not finding any portion of claimant’s permanent partial disability to be due to an accident arising out of and in the course of his employment. But for the decision by our Supreme Court in Czepial v. Krohne Roofing Co., Fla. 1957, 93 So. 2d 84, we would be of the opinion that the Deputy Commissioner’s Order accords with the essential requirements of law; however, in the Czepial case, our Supreme Court held that claimant would be entitled to compensation for disability caused by the aggravation of a pre-existing condition. * * *
“By the same token, the evidence in the instant cause indicates that although the claimant’s coronary was not occasioned by his employment, and the Deputy so found, there was an aggravation of the disability caused initially by the coronary, and we are of the opinion that under authority of the Czepial case, supra, the claimant is entitled to compensation for that portion of the disability caused by the acceleration or aggravation of his condition as a result of his continued employment. * *
The District Court of Appeal in holding there was not a compensable “accident” said: Text 31
“As the matter now stands, claimant’s coronary attack was not an ‘accident’ arising out of and in the course of his employment, but the order of the full comtnission, sending the case back to the deputy commissioner for the entry of an award if the employee’s subsequent work for approximately one week tended to aggravate or accelerate the pre-existing heart condition, in effect construes the law to be that an aggravation or acceleration of a non-compen-sable injury, incurred during the performance of one’s ordinary duties which involve no condition to which the public generally is not ordinarily exposed, is such an ‘accident’ and is compensable.”
* * * * ‡ *
“In the Czepial case, supra [93 So. 2d 86], our Supreme Court held as the basis for compensation that ‘claimant’s pre-existing tubercular condition was accelerated or aggravated by his continued work and failure to have care and rest, together with his inhalation of dust and fumes to which the public generally is not ordinarily exposed.’ We find from our study of the opinion in the Czepial case that the court found two things: (1) that claimant’s condition was accelerated or aggravated by the inhalation of dust and fumes to which the public generally is not ordinarily exposed, and (2) that therefore claimant' had suffered an injury by ‘accident,’ as the same is used in our Workmen’s Compensation Act, F.S.A. § 440.01 et seq. In the instant case the deputy found, on competent and substantial evidence that an ‘accident’ did not take place and, as a necessary corollary of this finding, that the claimant had not been exposed to a danger not ordinarily risked by the public.”
This Court in the earlier decision of S. H. Kress & Co. et al. v. Burkes, (1944), 153 Fla. 868, 16 So.2d 106, said:
“The question presented by this appeal is whether appellee sustained an injury by accident as defined by your Workmen’s Compensation Act. F.S.A. Sec. 440.01 et seq.
*580 “Appellee was working in a bakery mixing dough, baking bread and scrubbing pans. About a year before the hearing she began to suffer pain in her hands and noticed some knots forming on the back of her hands. The knots enlarged gradually; she bandaged her hands but they did not improve.
“She sustained no blow to her hands; did not remember the day the knots first appeared; she first felt pain and then noticed the knots. The examining physician testified:
“ ‘The patient came to me complaining of discomfort in the region of both wrists. She stated that in making bread both of her wrists got sore and some lumps had come on the back of her wrists, or hands as she said, but on the wrists proper. The affected parts were examined carefully and a diagnosis of tenosynovitis of the extensor tendons of both wrists, with ganglion formation in the region of both wrists, was made.’
“This condition undoubtedly was brought on by constant and repeated strain of the parts involved, occasioned by the type of work the woman had done over a period of months.”
This Court then held in a case certainly very much in point with the facts in the case at bar that the injury to the bakery worker was not compensable as an “accident” under the statutory definition of accident as an unexpected or unusual event, happening suddenly.
Mr. Justice Adams speaking for the Court said: Text 107
“The injury here cannot be said to be sudden. Claimant herself said it came on gradually and first appeared about a year before. No stated period can be given as sudden as applied to each case, as each must naturally depend on its own circumstances.”
The aggravation of the claimant’s injuries as the result of his accident with Kaler came on gradually while he was performing his ordinary duties with Carter. A careful reading of claimant’s own testimony shows convincingly that he did not sustain an injury or an aggravation of an injury by “accident” while employed by Carter. Accordingly, the petition for writ of certiorari must be denied.
It is so ordered.
TERRELL, Acting Chief Justice, and HOBSON, DREW and O’CONNELL, JJ., concur.